UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLEEN HUBER,<br><br>  Plaintiff,<br><br>  v.<br><br>JOSEPH BIDEN, et al.,<br><br>  Defendants. | Case No. 21-cv-06580-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Docket Nos. 48, 49 |

  Plaintiff Colleen Huber ("Plaintiff" or "Huber") filed this action against Defendants Joseph Biden Jr., in his official capacity as President of the United States of America, Twitter, Inc. ("Twitter"), and Jack Dorsey, the former Chief Executive Officer of Twitter (collectively, "Defendants") after Twitter suspended her account for violating its policy against disseminating harmful and misleading information related to COVID-19.  Docket No. 1 ("Compl.").  Plaintiff alleges that the White House and Twitter engaged in joint action and conspired to suspend her Twitter account, in violation of her freedom of speech rights under the First Amendment and the equal protection guarantee of the Fifth Amendment.  Docket No. 43 ("First Amended Complaint" or "FAC") ¶¶ 87–105, 106–15.

  Pending before the Court are the Defendants' motions to dismiss Plaintiff's First Amended Complaint.  Docket Nos. 48 ("Gov't Mot."), 49 ("Twitter Mot.").  For the following reasons, Defendants' motions to dismiss are **GRANTED**.

## I.  BACKGROUND

A. Factual History

  In February of 2021, Plaintiff tweeted a quote from an Israeli news article on her personal

Twitter account. FAC ¶¶ 34–35. The tweet stated: "Infection disease team: [Pfizer's experimental shot causes] 'mortality hundreds of times greater in young people compared to mortality from coronavirus without the #vaccine, and dozens of times more in the elderly.' https://[...]" *Id.*

Shortly after, Twitter notified Plaintiff that it suspended her account for "violating [its] policy on spreading misleading and potentially harmful information related to COVID-19" ("Twitter COVID-19 Policy"). *Id.* ¶ 36. The Twitter COVID-19 Policy states that users "may not use Twitter's services to share false or misleading information about COVID-19 which may lead to harm." Docket No. 49-3 at 2. For example, "sharing content that may mislead people about the nature of the COVID-19 virus; the efficacy and/or safety of preventative measures, treatments, or other precautions to mitigate or treat the disease . . . or the prevalence of the virus or risk of infection or death associated with COVID-19" violates the policy. *Id.* Further, Twitter's Terms of Service, which are part of the User Agreement, expressly provide that Twitter may "suspend or terminate" users' accounts, or "refuse to distribute" any user-generated content, for "any or no reason," including but not limited to if Twitter believes that users have "violated these Terms or the Twitter Rules and Policies." Docket No. 49-4 at 4, 7.[1]

After attempting to appeal the suspension, Plaintiff received an email that her account had been permanently suspended and that Twitter would not entertain any appeals. FAC ¶ 39. Plaintiff alleges that these actions were in furtherance of a conspiracy between Defendants to silence Twitter users from tweeting information that contradicted the political agenda of the Biden administration, specifically as it related to COVID-19 vaccinations. *Id.* ¶¶ 43–44. Defendants were allegedly in direct "engagement" with each other and the "objective of these direct communications with Twitter and the other social media giants was not merely to have these companies 'clamp down' on what the Biden administration considers bad speech, but also to tell

---

[1] Twitter requests that the Court take judicial notice of its COVID-19 Policy and its Terms of Service. Docket No. 50 ("RJN"). Plaintiff does not oppose. *See* Opp., Proposed Order ¶ 4. Because these policies are not in reasonable dispute and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," the Court **GRANTS** Twitter's request for judicial notice. *See* Fed. R. Evid. 201(b).

them exactly 'how they can get rid of it quickly.'" Docket No. 56 ("Opp.") at 6.

Plaintiff primarily bases this assertion on two news articles. FAC ¶¶ 42, 52. The first article, published by Reuters, states that unnamed White House officials reached out to social media companies including Twitter about "clamping down on COVID misinformation and getting their help to stop it from going viral." Docket No. 48-1 ("Reuters Article"). It also suggests that federal officials "[t]alk[ed] to social media companies, including Twitter, about the importance of misinformation and disinformation" and "[e]ncouraged providers to prevent COVID-19 misinformation from trending on [social media] platforms and becom[ing] a broader movement." *Id.* (internal quotation marks omitted). According to the Reuters Article, federal officials also "[w]ant[ed] to stop anti-vaccine events like a February protest organized on Facebook" and "[r]egular[ly] communicat[ed] with Twitter on a number of critical issues including COVID-19 misinformation." *Id*. (internal quotation marks omitted). The second article, on which Plaintiff relies, is published by The Verge and reports that a Twitter spokesperson confirmed that Twitter was "working in partnership with the White House to elevate authoritative information in regard to COVID-19." Docket No. 48-2 ("The Verge Article").

B.  Procedural History

On May 28, 2021, Plaintiff originally filed a complaint individually and on behalf of all other persons similarly situated. *See* Compl. On October 12, 2021, both Defendants filed motions to dismiss. Docket Nos. 38–39. Plaintiff then filed her First Amended Complaint on October 25, 2021, alleging two claims for relief: (1) her First Amendment right to freedom of speech; and (2) her Fifth Amendment right of equal protection. *See* FAC. Two days later, the original motions to dismiss were terminated. *Id.* On November 8, 2021, Defendants filed the present motions to dismiss. *See* Gov't Mot.; Twitter Mot. The hearing took place on February 4, 2022.

## II.   LEGAL STANDARD

A.  Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). *See* Fed. R.

3

1  Civ. P. 12(b)(6).

2  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] must . . . suggest that the claim has at least a plausible chance of success." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (internal quotation marks omitted). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

If the court dismisses a complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

B.   Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss a claim for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Lack of Article III standing "requires dismissal for lack of subject matter jurisdiction" under Rule 12(b)(1). *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). The "irreducible constitutional minimum" of standing requires that a plaintiff show that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). As the party invoking federal jurisdiction, the plaintiff "bears the burden of establishing these elements." *Id.* at 1547.

4

## III.     DISCUSSION

A.     Plaintiff's First Amendment Freedom of Speech Claim

The parties dispute whether Plaintiff alleges a plausible First Amendment violation. Plaintiff alleges that Twitter conspired with President Biden and other federal government officials in the Biden Administration to engage in viewpoint discrimination and violate her First Amendment rights. FAC ¶ 3. Specifically, she alleges that Defendants suspended her Twitter account in furtherance of their "agreement to silence the speech of speakers on Twitter" who disagreed with the political agenda of the Biden administration. *Id.* ¶ 43.

"The Free Speech Clause of the First Amendment prohibits only governmental, not private, abridgment of speech." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1924 (2019). In this case, Plaintiff concedes that Twitter is a private entity. FAC ¶ 11. The Ninth Circuit has also recently reaffirmed that "a private entity hosting speech on the Internet is not a state actor." *Prager Univ. v. Google LLC*, 951 F.3d 991, 997 (9th Cir. 2020). Thus, the First and Fifth Amendments are not implicated unless there is a sufficient factual predicate establishing that Twitter is a state actor.

The "state action inquiry boils down to this: is the challenged conduct that caused the alleged constitutional deprivation fairly attributable to the state?" *Belgau v. Inslee*, 975 F.3d 940, 946 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2795 (2021) (internal quotation marks omitted); *see also Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains"). A "private party cannot be treated like a state actor where the government's involvement was only to provide 'mere approval or acquiesce,' 'subtle encouragement,' or 'permission of a private choice.'" *Belgau v. Inslee*, 975 F.3d 940, 947 (9th Cir. 2020) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52–54 (1999)).

"The Supreme Court has articulated four tests for determining whether a private [party's] actions amount to state action." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (internal quotation marks omitted). The four tests include: (1) the public function test; (2) the state compulsion test; (3) the governmental nexus test; and (4) the joint action test. *Id.*

1    Here, the joint action test is the only test at issue because Plaintiff does not discuss or rely on the others. Opp. at 7. The joint action test asks, "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Tsao,* 698 F.3d at 1140 (internal quotation marks omitted). This requirement can be satisfied by either "[1] proving the existence of a conspiracy or [2] by showing that the private party was a willful participant in joint action with the State or its agents." *Id.* (internal quotation marks omitted).

### 1. Plaintiff Fails to Plausibly Allege the Existence of a Conspiracy

Plaintiff bases her claim solely on the first prong: the existence of a conspiracy. Opp. at 17–18. To prove the existence of a conspiracy between a private actor and the government, "an agreement or meeting of the minds to violate constitutional rights must be shown." *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983) (internal quotation marks omitted). Each participant in the conspiracy "need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002). Further, "[t]o be liable as a co-conspirator, a private defendant must share with the public entity the goal of violating a plaintiff's constitutional right." *Id.* "Proof of a conspiracy can be provided by either direct or circumstantial evidence." *United States v. Loveland*, 825 F.3d 555, 561 (9th Cir. 2016).

Plaintiff alleges that Defendants had a partnership to censor speech critical of COVID-19 vaccinations and to promote the Biden Administration's policy in favor of vaccination. Opp. at 11; FAC ¶ 54. Specifically, she contends they came to "an agreement, meeting of the minds, and/or common understanding to violate the constitutional rights of Plaintiff and the constitutional rights of others who are similarly situated." FAC ¶ 59. Twitter allegedly suspended Plaintiff's account in furtherance of this conspiracy. *Id.* ¶ 38. Plaintiff also contends that Defendants mutually benefit from this conspiracy, because it "promotes and benefits the Biden administration's political agenda" and "financially benefits Twitter [and] Dorsey, as Twitter receives favorable treatment by and publicity from the Biden administration."[2] *Id.* ¶ 47.

---

[2] Plaintiff initially named Jack Dorsey, Twitter CEO, as a defendant in the FAC, but now does not oppose Twitter's motion to dismiss Dorsey from the lawsuit. Opp. at 32 n.12. However, Plaintiff

6

Defendants deny that they formed a partnership to conspire against Plaintiff. The Ninth Circuit has explained that "[w]hether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding[] to achieve the conspiracy's objectives." *Mendocino Env't Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301–02 (9th Cir. 1999) (internal quotation marks omitted).

In *Mendocino Env't Ctr.*, 192 F.3d 1283 (9th Cir. 1999), the Ninth Circuit held that the plaintiffs, environmental organization activists, presented sufficient circumstantial evidence that the police department entered into a conspiracy with the FBI to inhibit the plaintiffs' First Amendment activities for their claim to survive a summary judgment motion. *Id.* at 1302. The plaintiffs were arrested after a bomb went off in their car. *Id.* at 1292. The FBI "apparently took the lead in investigating the physical evidence," but the police officers were at the scene and examined the evidence. *Id.* Despite being at the crime scene, the police relied on FBI agents' conclusions that the bomb was located behind the driver's seat and an FBI agent's statement that nails used in the bomb were "identical" to nails found in a bag in the plaintiff's car to obtain the search warrant. *Id.* at 1289. The court listed five different pieces of circumstantial evidence that the police department and the FBI, together, intended to inhibit plaintiffs' First Amendment activities, and that they entered a conspiracy to further such goal. *Id.* Specifically, "the fact that the [police] had themselves viewed the crime scene and the physical evidence raises a question as to whether they would have relied upon the FBI agents' questionable characterization of the evidence absent an improper motive or conspiracy." *Id.* Further, the court noted that "some of the misinformation included in, and some of the material omissions from the search warrant affidavits were directly attributable to the [police], which permits the inference of an improper motive for such conduct." *Id.* The police department also publicized inaccurate info to the media, which was

---

requests that the Court exercise its discretion and dismiss Dorsey without prejudice so that if she learns of additional facts during discovery that implicate Dorsey personally in the matters alleged, she will have the option to rename him as a defendant. *Id.* Because this Court dismisses Plaintiff's FAC in its entirety with prejudice, this Court **DISMISSES** Dorsey as a defendant with prejudice.

7

"consistent with a desire to create a negative impression." *Id.* It had a police division that monitored the plaintiffs and cooperated with the FBI prior to the bombing incident, and the police had stated in their search warrant affidavit that they believed appellees to be "members of a violent terrorist group." *Id.*

Unlike the defendants in *Mendocino Env't Ctr.*, Plaintiff does not allege that President and Twitter worked hand-in-hand to suspend her Twitter account. She does not even allege that Twitter would not have suspended her Twitter account absent an improper motive or conspiracy. And she does not allege that Twitter failed to exercise independent judgment when it suspended her account. *See United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989) (noting that evidence that police failed to exercise independent judgment will support an inference of conspiracy with a private party).

The conclusion that Twitter did not suspend Plaintiff's account because of an alleged conspiracy with the White House, is corroborated by the fact that Plaintiff violated Twitter's Terms and Service and Twitter has provided a good and sufficient basis to suspend her account. Plaintiff does not dispute that she, like all Twitter users, is subject to Twitter's User Agreement as a condition of using her account. Twitter's User Agreement includes its Terms of Service, which expressly state that Twitter may "suspend or terminate" users' accounts, or "refuse to distribute" any user-generated content, for "any or no reason," including but not limited to if Twitter believes that users have "violated these Terms or the Twitter Rules and Policies." Docket No. 49-4 at 4, 7. Twitter suspended Plaintiff's account for violating its express Terms of Service, namely its COVID-19 Policy, which provides that users may not share or post content "that may mislead people about . . . the efficacy and/or safety of preventative measures, treatments, or other precautions to mitigate or treat the disease . . . ." Docket No. 49-3 at 2; FAC ¶¶ 34, 36. In short, Twitter had clear independent grounds for suspending Plaintiff's account. It took no action out of the ordinary or in contravention of its clear established authority which have would suggested influence or facilitation by President Biden. There is no showing here that the action taken by Twitter on Plaintiff's account was not an independent one. *See The Informed Consent Action Network ("ICAN") v. YouTube LLC,* No. 20-CV-09456-JST, 2022 WL 278386, at *6 (N.D. Cal.

Jan. 31, 2022) (internal quotation marks omitted) (alterations omitted) (finding that the plaintiffs failed to allege that "governmental direction . . . dictate[d] . . . the standard for decision[,]" and that the "independent professional judgments" defeated the "requisite nexus to the government" to establish joint action).

In a similar case, Judge Breyer held that there was no evidence of joint action between Twitter and the government to suspend accounts that posted false or misleading information about elections, in part because "Twitter's Terms of Service gave it unlimited authority to remove or discipline accounts . . . and Twitter referenced its own policies when it exercised that authority." *O'Handley v. Padilla*, No. 21-CV-07063-CRB, 2022 WL 93625, at *11 (N.D. Cal. Jan. 10, 2022). Judge Breyer found that "[r]egardless of the percentage of flagged tweets that Twitter ultimately removed, there is ample evidence that it was Twitter who decided whether to remove them." *Id*; *see also Doe v. Google* No. 20-CV-07502-BLF, 2021 WL4864418, at *5 (N.D. Cal. Oct.19, 2021) (rejecting a claim of state action under the joint action theory because there were "no allegations that Defendants invoked state or federal procedure to bring about the suspension of Plaintiffs' accounts").

Plaintiff also does not allege that the Biden Administration dictated to Twitter any specific prescription of any particular course of action. Not only did Twitter have the independent reason and authority to suspend Plaintiff's account pursuant to its terms of service—which predated the government's statements about COVID-19 disinformation—Plaintiff presents no facts that indicate Twitter had any real incentive to conspire to violate Plaintiff's rights. Nor does she allege that Twitter had any malice towards Plaintiff.

Instead, Plaintiff merely presents conclusory and generalized statements to allege a conspiracy between Defendants. She relies solely on the Reuters Article and The Verge Article to prove that there was a "direct engagement between the Biden administration and the social media giants" to partner together to "'clamp[] down' on disfavored speech" and figure out "'how to get rid of it quickly' as part of [their] 'wartime effort.'" Opp. at 8. But the general statements described in these articles do not establish with any specificity an agreement between the Defendants to violate Plaintiff's rights. Although Plaintiff argues that encouragement becomes

9

conspiracy when the government tells the private actor not only what the government wants them to do, but also shows them how to do it, there are no such detailed step-by-step directives as to the closure of Plaintiff's Twitter account alleged here.  Plaintiff's conclusory allegations are not enough to show conspiracy.  *See Burns v. Cty. of King*, 883 F.2d 819, 821 (9th Cir. 1989) (pointing out that a plaintiff must state specific facts to support the existence of a claimed conspiracy).  "[G]eneralized statements about working together to counteract the dissemination of election misinformation" do "not support an inference of an illegal conspiracy." *O'Handley*, 2022 WL 93625, at *11 (internal citation omitted).  The fact that a government official sent a  message to Twitter, flagging a O'Handley tweet "might demonstrate a meeting of minds to promptly address election misinformation, but not a meeting of the minds to 'violate constitutional rights,' let alone O'Handley's constitutional rights." *Id.* (alterations omitted).

        Similarly, in *Federal Agency of News LLC v. Facebook, Inc*., the court addressed the conspiracy prong of the joint action test and found that the plaintiff's "single conclusory allegation that Facebook's work with the U.S. government concerning Russian interference in U.S. elections [was] a 'conspiracy to deny [plaintiff] its free speech rights guaranteed under the U.S. Constitution'" was not enough to overcome a motion to dismiss.  432 F. Supp. 3d 1107, 1126 (N.D. Cal. 2020).  The court recognized that "[t]o properly plead joint action, a plaintiff must allege that the state was involved with the activity that caused the injury giving rise to the action." *Id.* at 1125 (internal quotation marks omitted).  It held that "there was no joint action because Plaintiffs fail[ed] to allege specific facts establishing the existence of an agreement or a 'meeting of the minds' between Facebook and the government relating to Facebook's deletion of [plaintiff's] Facebook page or restriction of [plaintiff's] access to its Facebook account." *Id.* at 1126.

        Like the plaintiffs in *O'Handley* and *Federal Agency of News*, Plaintiff does not allege that the government was directly involved in the suspension of her Twitter account.  Indeed, unlike *O'Handley* where a member of the government allegedly flagged one of O'Handley's tweets for Twitter's review, Plaintiff does not allege that the government was involved in the process of flagging her Tweets or in deciding her (or anyone's) Twitter accounts should be suspended.  At

best, Plaintiff's allegations may suggest a shared general interest in reducing online COVID-19 misinformation, but that shared interest does not support a finding of a conspiracy between the government and Twitter to violate Plaintiff's First Amendment rights.

Even if it could be inferred that Twitter acquiesced in the government's implied suggestion to shut down sources of disinformation about COVID-19, "mere acquiescence" is not enough to prove a conspiracy. *Fonda*, 707 F.2d at 438. In *Fonda*, the Ninth Circuit recognized that the "mere acquiescence of the bank employees to the investigation request of the FBI to view Fonda's bank records is, without more, insufficient to prove a conspiracy." *Id.* Further, the court held that a "necessary element of the conspiracy claim" which was a "meeting of the minds between the banks and the FBI to *knowingly attempt* to accomplish an alleged wrongful purpose" was absent. *Id.* at 439 (emphasis added). There is no allegation of a meeting of the minds between President Biden, Twitter, and Jack Dorsey to "accomplish an alleged wrongful purpose."

Plaintiff's theory, if accepted on this read of the FAC, would raise serious policy concerns. Holding that mere acquiescence by private entities to the government's encouragement of broad policy is sufficient to establish state action would thereby effectively conscript private actors into service as governmental agents subject to the constraints and obligations of the Constitution. It would substantially obfuscate the line between public and private action under the Constitution. *See Ennis v. City of Daly City*, No. C-09-05318-MHP, 2011 WL 672655, at *5 (N.D. Cal. Feb. 16, 2011) (if general allegations of joint action or conspiracy were enough to establish state action, "then any individual might be liable as a joint actor or conspirator with state defendants anytime state defendants act in a manner arguably beneficial to that individual or anytime an individual enlisted the aid of the police.").

A broad reading of state action in this context would raise potential First Amendment concerns. It is well-established that the First Amendment protects the "exercise of [a publisher's] editorial control and judgment." *Mia. Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). For example, courts have recognized that "[s]ocial media platforms have a First Amendment right to moderate content disseminated on their platforms." *Netchoice, LLC v. Paxton*, No. 21-CV-840-RP, 2021 WL 5755120, at *7–8 (W.D. Tex. Dec. 1, 2021), *appeal docketed*, No.

11

21-51178 (5th Cir. Dec. 7, 2021). In fact, a court in this district has recently held that "Twitter has important First Amendment rights that would be jeopardized by a Court order telling Twitter what content-moderation policies to adopt and how to enforce those policies." *O'Handley*, 2022 WL 93625, at *15. Constraining Twitter to First Amendment standards in the exercise of its editorial rights thus itself raises countervailing First Amendment concerns. Accordingly, finding a private entity is a state actor through a claim of conspiracy must require more than a broad brush claim of shared interests. As the cases correctly hold, conclusory allegations are not enough; the conspiracy must be based on a specific agreement (and action taken pursuant thereof) to take action violative of the rights of the claimant.

2. <u>Plaintiff Fails to Allege the Interdependence Necessary to Show Joint Action</u>

There is another way to establish state action—willful participation in joint action with the state. "The joint action inquiry focuses on whether the state has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." *Gorenc v. Salt River Project Agr. Imp. & Power Dist*., 869 F.2d 503, 507 (9th Cir. 1989) (internal quotation marks omitted). Joint action requires a "substantial degree of cooperative action." *Collins v. Womancare,* 878 F.2d 1145, 1154 (9th Cir. 1989). *Collins* found the theory inapplicable in circumstances similar to those here. In *Children's Health Defense v. Facebook, Inc.*, the court held that "general statements by the CDC and Zuckerberg about 'working together' to reduce the spread of health or vaccine misinformation, or to promote universal vaccination do not show that the government was a 'joint participant in the challenged activity.'" No. 20-CV-05787-SI, 2021 WL 2662064, at *6 (N.D. Cal. Jun. 29, 2021), *appeal docketed*, No. 21-16210 (9th Cir. July 21, 2021). There, Children's Health Defense ("CHD") sued Facebook, alleging that "Facebook willfully participated in joint action with Rep. Schiff, CDC and CDC Foundation, and/or WHO officials or their agents to enforce CDC and WHO policies through Facebook's signature algorithms and machine learning to define, identify, label as 'false news' and/or censor Plaintiff's speech with respect to vaccine-related speech."

In support of its argument, CHD provided a letter from Representative Schiff to Facebook CEO, Mark Zuckerberg, identifying himself as "a Member of Congress who is deeply concerned

12

about declining vaccination rates around the nation." *Id*. at *2 (internal quotation marks omitted). In the letter, Representative Schiff "urge[d] that Facebook implement specific algorithms to identify, censor and remove all so-called vaccine misinformation." *Id.* (internal quotation marks omitted). Zuckerberg had also allegedly "stated publicly that Facebook is working with both the CDC and the WHO . . . to remove clear misinformation about health-related issues that could cause an imminent risk of harm." *Id.* at *11 (internal quotation marks omitted). Notwithstanding these claims, the court ultimately held that general statements made by Facebook, the CDC, or other entities within the federal government about working together to remove misinformation did not show that Facebook had worked in concert with the CDC to censor CHD's speech or violate CHD's constitutional rights. *Id*. at *11.

Recently, the court in *ICAN* did not find joint action for similar reasons. 2022 WL 278386, at *1. In *ICAN*, YouTube terminated ICAN's account after removing several of their videos for violating YouTube's policy against spreading medical misinformation pertaining to COVID-19. *Id*. Facebook acted similarly and unpublished ICAN's page after removing several videos. *Id*. ICAN made two arguments in support of its joint action theory: (1) "that the FAC plausibly alleges joint action based on the statements made by Defendants and members of Congress, namely Congressman Schiff's commitment to monitoring the effectiveness of the changes in policies made by Defendants, and Defendants' reciprocal commit[ment] to working with [m]embers of Congress[;]" and (2) "that the FAC alleges that Defendants censored ICAN in accordance with rule[s] of decision supplied by the Government." *Id.* (internal quotation marks and citations omitted). Of relevance, the court reasoned that "neither Defendants' public statements indicating their intent to work with Congress, nor the statements by members of Congress urging Defendants to take action, nor the media reports of unspecified collaboration between Defendants and Schiff are sufficient to show that the Government was a joint participant in the challenged activity." *Id.* at *4 (internal quotation marks and citation omitted).

Like the statements put forth by the plaintiffs in *ICAN*, the articles offered by Plaintiff in this case are not sufficient to show that the Government was a joint participant in the challenged activity. The courts in *ICAN* and *Children's Health Defense* recognized that the comment of one

legislator could not be imputed to the entire federal government. Similarly, here, the alleged comments made by unnamed White House officials cannot be imputed to the President. Moreover, as discussed above, statements about working together with the government to prevent the spread of misinformation do not equate to working in concert to violate constitutional rights. Plaintiff has therefore failed to allege joint action by way of conspiracy or by way of willful participation.

### 3. Section 230 of the Communications Decency Act

#### a. Section 230 Cannot Be an Independent Basis for Plaintiff's First Amendment Claim

Plaintiff contends that Section 230 of the Communications Decency Act ("CDA") violates the First Amendment. Section 230 provides immunity to providers of interactive computer services, such as Twitter, for suppressing certain kinds of speech. *See* 47 U.S.C. § 230. It recites, "No provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." *Id.* § 230(c)(2)(A).

Plaintiff alleges that the California Unruh Civil Rights Act ("Unruh Act") protects her freedom of speech and because Section 230 preempts the Unruh Act, Congress's enactment of Section 230 constitutes governmental action that violates the First Amendment. Opp. at 17. This novel argument stems from a footnote in Justice Thomas's concurrence in *Biden v. Knight First Amendment Institute At Columbia University*, where he acknowledged that "some commentators have suggested that immunity provisions like § 230 could potentially violate the First Amendment to the extent those provisions pre-empt state laws that protect speech from private censorship." *Knight*, 141 S. Ct. 1220, 1227 n.5 (2021) (Thomas, J., concurring) (citing Eugene Volokh, *Might Federal Preemption of Speech-Protective State Laws Violate the First Amendment?* THE VOLOKH CONSPIRACY, REASON (Jan. 23, 2021), https://reason.com/volokh/2021/01/23/might-federal-

14

preemption-of-speech-protective-state-laws-violate-the-first-amendment/).[3] "According to that argument, when a State creates a private right and a federal statute pre-empts that state law, 'the federal statute is the source of the power and authority by which any private rights are lost or sacrificed.'" *Id.* (quoting *Railway Employees v. Hanson*, 351 U.S. 225, 232 (1956)). This theory would undermine a digital platform's immunity under Section 230; an immunity which "eliminates the biggest deterrent—a private lawsuit—against caving to an unconstitutional government threat." *Id.*

The Volokh article that Justice Thomas relied upon discusses *Railway Employees v. Hanson* and *Denver Area Educational Telecommunications Consortium, Inc. v. F.C.C.*, as the bases of its theory.[4] In *Hanson*, the Supreme Court held that Congress's enactment of a federal law, which preempted state laws protecting the freedom to associate, constituted government action subject to First Amendment scrutiny. *Hanson*, 351 U.S. at 232. There, employees of a railroad company who did not want to join a labor organization, challenged a union shop agreement that required all employees of the railroad, as a condition of their employment, to become members of a specified union. *Id.* at 227. The plaintiffs asserted that the union shop agreement violated the "right to work" provision of the Nebraska Constitution, which stated that no person shall be denied employment because of his or her refusal to join a labor organization. *Id.* at 228. The defendant contended that the Nebraska Constitution and laws did not control because the federal Railway Labor Act authorized the union shop agreement. *Id.* The Railway Labor Act authorized a carrier or labor organization to require all employees to become a member of the labor organization, notwithstanding the law of any state. *Id.* at 228–29.

---

[3] In *Knight First Amendment Institute at Columbia University v. Trump*, 928 F.3d 226, 230 (2d Cir. 2019), the Second Circuit held that then-President Donald Trump's decision to block certain users from interacting with his Twitter account violated the First Amendment. After Trump lost the presidential election in 2020, the Supreme Court vacated the Second Circuit's judgment and remanded the case with instructions to dismiss as moot. *Knight*, 141 S. Ct. at 1220.

[4] Volokh, however, concludes that his analysis may be mistaken for a number of reasons, including that perhaps *Hanson* and *Denver Area* "are themselves mistaken in applying First Amendment scrutiny" or that there are other precedents that "pull sufficiently in the opposite direction." Eugene Volokh, *Might Federal Preemption of Speech-Protective State Laws Violate the First Amendment?* THE VOLOKH CONSPIRACY, REASON ¶ 5 (Jan. 23, 2021).

The plaintiffs responded that the Railway Labor Act violated their First Amendment rights but the defendant argued that the Railway Labor Act did not impair any rights because it did not compel employees to enter into union shop agreements. *Hanson v. Union Pac. R. Co.*, 160 Neb. 669, 698 (1955), *rev'd sub nom. Ry. Emp. Dep't v. Hanson*, 351 U.S. 225 (1956). Any impairment of rights stemmed from private union shop agreements, not government action, in the defendant's view. *Id.* The Supreme Court of Nebraska rejected this argument. It held that there was government action that must be evaluated under the First Amendment because in the Railway Labor Act, Congress expressly struck down the laws of 17 states that prohibited union shop agreements. *Id.* "Such action on the part of Congress is a necessary part of every union shop contract entered into on the railroads as far as these 17 states are concerned for without it such contracts could not be enforced therein." *Id.* The Supreme Court of Nebraska held that the union shop agreement violated the First Amendment because it deprived the employees of their freedom of association and therefore there was no valid federal law that preempted the "right to work" provision of the Nebraska Constitution. *Id.* at 699–70. The U.S. Supreme Court agreed that there were justiciable questions under the First Amendment because the Railway Labor Act "sought to strike down inconsistent laws in 17 States." *Hanson*, 351 U.S. at 231. The Supreme Court concluded that government action impaired the plaintiffs' rights because the Railway Labor Act was "the source of the power and authority by which any private rights are lost or sacrificed" and the "enactment of the federal statute authorizing union shop agreements [was] the governmental action on which the Constitution operates." *Id.* at 232. The Supreme Court, however, reversed the Nebraska Supreme Court's decision and held that the Railway Labor Act was consistent with the First Amendment. *Id.* at 238.

Relying on *Hanson*, the Volokh article theorized that Section 230, which allows certain companies to restrict speech, could potentially violate the First Amendment to the extent its provisions pre-empt state laws that protect speech from private censorship. The Supreme Court, however, has recently noted that the proposition in *Hanson*—a federal law that is permissive but not mandatory is sufficient to establish governmental action—"is even more questionable today." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2479 n.24 (2018).

16

1  The Supreme Court has not resolved this question. *Id.*

2  In *Denver Area*, the Supreme Court addressed First Amendment challenges to three
3  provisions of the Cable Television Consumer Protection and Competition Act of 1992, which
4  empowered cable operators to "regulate the broadcasting of 'patently offensive' sex-related
5  material on cable television." *Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*,
6  518 U.S. 727, 732 (1996). The first provision permitted cable operators to decide whether or not
7  to broadcast such material on leased channels, the second provision required leased channel
8  operators to segregate and block the programming, and the third provision permitted cable
9  operators to regulate such material on public access channels. *Id.* at 733. Before the enactment of
10 these provisions, federal law prohibited these channels from exercising any control over program
11 content. *Id.* at 781–82. In a splintered plurality opinion, the Supreme Court upheld the first
12 provision but struck down the second and third provisions under the First Amendment because
13 they were not narrowly tailored to achieve the compelling interest of protecting children. *Id.*
14 Importantly, for the purposes of this case, the Ninth Circuit clarified that "if any controlling state
15 action analysis emerged from *Denver Area*," it is that "state action exists when 'Congress singles
16 out one sort of speech for vulnerability to private censorship in a context where content-based
17 discrimination is not otherwise permitted.'" *Roberts v. AT&T Mobility LLC*, 877 F.3d 833,
18 840–41 (9th Cir. 2017) (quoting *Denver Area*, 518 U.S. at 782). That said, as the Ninth Circuit
19 acknowledged, "[i]n the 21 years since it was published, the Supreme Court has never cited
20 *Denver Area* in addressing state action." *Id.* at 840.

21 Plaintiff's argument fails for two reasons. First, Section 230 does not single out one kind
22 of speech as suitable for private censorship; it protects generally editorial discretion over a wide
23 range of matters. It is therefore distinguishable from *Denver Area*. As the court held in *Divino*
24 *Grp. LLC v. Google LLC*, No. 19-CV-04749-VKD, 2021 WL 51715, at *7 (N.D. Cal. Jan. 6,
25 2021), "unlike the statute at issue in *Denver* Area, which permitted cable system operators to ban
26 specific content, Section 230 of the CDA does not single out particular types of speech as suitable
27 for private censorship." Second, the viability of the state action holding of *Hanson* is
28 questionable. *See Janus*, 138 S. Ct. at 2479 n.24. Moreover, this case is distinguishable from

*Hanson*. As explained above, in *Hanson*, the Supreme Court held that the enactment of the Railway Labor Act, which preempted the state laws protecting the freedom to associate, constituted government action subject to First Amendment scrutiny. *Hanson*, 351 U.S. at 232. Here, Plaintiff alleges that her freedom of speech is protected by the Unruh Act and because Section 230 allows certain companies to restrict speech, it preempts the Unruh Act and violates the First Amendment. Opp. at 15.

But the premise of Plaintiff's argument is false—the Unruh Act does not protect speech. The Unruh Act only prohibits "business establishments of every kind" from discriminating against "[a]ll persons" on the basis of their "sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status." Cal. Civ. Code § 51(b). The Unruh Act has not been held to protect persons based on their viewpoints. Plaintiff asserts that California courts have interpreted the Unruh Act "to go beyond the explicit list of prohibitive forms of discrimination in the statute" and "to include any arbitrary discrimination by a business." Opp. at 14. Her reliance on *Rotary Club of Duarte v. Bd. of Dirs.*, 178 Cal. App. 3d 1035, 1047 (Cal. App. 2d Dist. 1986) is misplaced. Although the California Court of Appeal held that the Unruh Act prohibits "any arbitrary discrimination by a business" the case concerned discrimination on the basis of sex. *Rotary Club*, 178 Cal. App. 3d at 1047. Plaintiff cites no authority holding that the Unruh Act applies to discrimination on the basis of viewpoints or content of speech. Because Section 230 does not preempt the Unruh Act and thus does not affect speech protected by the Act, there is no justiciable First Amendment claim.

Accordingly, Section 230 does not provide an independent basis for Plaintiff's First Amendment claim. Given the infirmities in the FAC, any future amendment would be futile. The Court **GRANTS** Defendants' motions to dismiss Plaintiff's First Amendment claim without leave to amend.

    b. <u>Constitutionality of Section 230</u>

To the extent that Twitter relies on Section 230 immunity to argue that Plaintiff's claims of Twitter's liability are barred, she seeks declaratory relief that Section 230 is unconstitutional

18

because it violates the First Amendment. FAC ¶ 4; Opp. at 27. But because Plaintiff's First and Fifth Amendment claims can be resolved on non-constitutional grounds, it is unnecessary to adjudicate this constitutional question. *See Spector Motor Service v. McLaughlin*, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable"); *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter").

B.  Plaintiff's Fifth Amendment Equal Protection Claim

Plaintiff also alleges that Defendants violated her Fifth Amendment right to equal protection. Specifically, she claims that "[b]y granting use of a forum (the Internet and Twitter) to people whose views Defendants find acceptable, but denying or restricting use to those expressing less favored or more controversial views, such as those expressed by Plaintiff and others similarly situated, Defendants have violated the equal protection guarantee of the Fifth Amendment." FAC ¶ 112. She agrees with Defendants, however, that her "Fifth Amendment Equal Protection Claim rises or falls along with the First Amendment Free Speech Claim insofar as both claims are predicated upon the same facts." Opp. at 21 n.7.

For the reasons stated above, Plaintiff does not plausibly allege that Twitter was acting as a state actor because she does not provide facts that plausibly allege joint action between Defendants. As such, Plaintiff's Fifth Amendment claim is dismissed, in addition to her First Amendment claim. *See S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 523 (1987) (rejecting a Fifth Amendment equal protection claim against the United States Olympic Club because they were "not a governmental actor" to which the Constitution applies).[5]

---

[5] And even if this Court found that Twitter's conduct amounts to state action, Plaintiff does not provide any facts indicating that Twitter engaged in discrimination aside from the conclusory allegations previously listed. Twitter contends that its "editorial policies apply equally to all individuals and all viewpoints." Twitter Mot. at 5. Although Plaintiff alleges that those "who criticized the government's vaccination policy were discriminated against" she does not "identify a single Twitter user who was treated more favorably than she was treated." *Id*.

Accordingly, this Court **GRANTS** Defendants' motions to dismiss Plaintiff's Fifth Amendment claim without leave to amend.

### IV. <u>CONCLUSION</u>

For the reasons explained above, the Court **GRANTS** Defendants' motions to dismiss Plaintiff's FAC in its entirety with prejudice.

This order disposes of Docket Nos. 48 and 49. The Clerk of Court is instructed to enter Judgment and close the case.

**IT IS SO ORDERED**.

Dated: March 18, 2022

_____
EDWARD M. CHEN
United States District Judge